Great. Um, can you, uh, counsel, can you help us? I know that, uh, two of you have split time and, uh, I'm sorry, I don't have the numbers for the split in front of me. Sure, your honor. I'm taking 11 minutes for the NLRB for the party and the intervener union. Mr. Jarvis will be taking four. Okay, uh, 11. And who's going to be reserving? I am, your honor. Okay, great. And how much time are you reserving, please? I'd like to reserve three minutes. Very well. Uh, great. Well, uh, welcome, one and all. Happy to have you on this bright and sunny day in beautiful downtown Newark, New Jersey. Uh, and let's, uh, let's begin. Go ahead, sir. Thank you, your honor. May it please the court. My name is Michael Keneally on behalf of Atlantic City Electric Company. The board's ruling that system operators aren't supervisors lacks substantial evidence and conflicts with its ruling just last year in Entergy 3. There, the board ruled that another group of electrical control room workers were supervisors because of four of their functions addressing problems in their company's electrical system. First, they determined which outages were priorities. Second, they determined when to redirect field employees from one outage to another. Third, they determined how many field employees to send to an outage. And fourth, they determined when it was necessary to call in additional field employees. Mr. Keneally, before we start distinguishing Energy 3 with our facts or NSTAR's facts, um, one of the issues that's raised is this issue of the standard of proof and whether or not, and I'd like you to clarify whether the board and or the regional director failed to apply preponderance of the evidence. So can you tell me are you accusing one or both of them of failing to do so? And second, how did you preserve that issue so that the, um, NLRB would have known that you were unhappy with how it was articulated? Sure, Your Honor. So we, we do, did object to the regional director's, uh, assessment of the evidentiary principles. And we did so both in our request for review at AR 623 and in our refund review at AR 703. What do you mean by evidentiary principles? What does that mean? How would it, how would a decision maker know you're not disputing the admissibility of evidence as compared to the standard of proof? Well, I don't think we, we made any challenges, uh, to the regional director's, uh, admission of evidence. So we quoted from the regional director's own decision where the regional director sets out, uh, background evidentiary principles, starting with the idea that supervisory status needs to be construed narrowly, uh, because it removes, uh, workers from the NLRA's, uh, coverage. Uh, and then, uh, to that end, uh, the states, the board's, um, requirement that it will not find supervisory status where the evidence is in conflict or otherwise inconclusive. And so we quoted that full discussion and said that that was, uh, unduly restrictive and that it was inconsistent with the NLRA and with section, uh, 211 itself. Uh, I'm sorry. Go ahead. So sorry. Go ahead. Well, I mean, that, that, that sounds obtuse. I mean, uh, you know, we, we've got three, uh, third circuit judges. If we, if you, if you ask each of us, what does that mean? I'm sure you'd come up with at least three different answers, possibly more. I was someone to divine that, that what you're talking about is that, uh, you think that the standard was clear and convincing as opposed to, uh, preponderance of the evidence. Well, your honor, I, I would, I would distinguish the issue preservation standard in NLRA cases, uh, from the standard, uh, for preserving an issue in the issue is not as the, if the objection is not raised, uh, to the board. And so there's no plain error standard or anything like that. And as a result, I think the case law applies a more relaxed, uh, issue preservation standard. And I would point to this, this court's, uh, case in 2016 and FedEx where they're the court ruled that a single sentence in a footnote asking the court, sorry, uh, uh, uh, objecting to the board's, uh, standard largely for the reasons, uh, articulated in a dissent that was sufficient to preserve the issue for this court's review. So I think we did well more than that here. Not only did we object that the standard, uh, sorry, but the evidentiary principles were inconsistent with the act, but we also cross-referenced, uh, chairman, uh, uh, arguments in Buchanan Marine and in related cases where he repeatedly faulted the board for this. Uh, I would also argue, however, that this issue is in some ways academic, this issue preservation issue, because there's no doubt that this court has, um, the authority and, uh, responsibility to review our argument that there's a lack of substantial evidence for the board's conclusions in this case. I don't think anyone disputes that. And much as in the Allentown Mac case, the Supreme Court case on which we principally rely for this, uh, clear and convincing evidence objection, there the Supreme Court first ruled that there was a lack of substantial evidence. And only then did it go on to the broader question of whether the lack of substantial evidence finding in that case was indicative of a larger problem in the board's jurisprudence, uh, in, in surreptitiously increasing the standard of review. And so we would submit you could do the same thing here. You don't need to reach the question of whether, uh, uh, a lack of, uh, or sorry, the evidence, uh, the requirement that evidence not be in conflict or, uh, that the evidence be clear is permissible in order to rule that the board is not allowed to disregard evidence that conflicts. That's a well-settled principle in substantial evidence review, uh, dating back to the Supreme Court's universal camera. Why isn't what the board did here? Wait, wait, wait, wait. I mean, it's, uh, it's a, it's a, it's a balancing, uh, noticing or discerning conflict is a matter in which one determines balancing. Well, if the board had actually held that some of the evidence was more persuasive than other evidence, that might be a fair question. But here the board didn't say that the evidence presented by the employer, uh, was unpersuasive or, uh, not credible. It simply noted that it was in some tension in the board's view with some of the testimony that one of the witnesses said during his direct examination. This is Jim Luciani's testimony. Um, and that is not enough because as the cases that we cite, uh, in our reply brief show the court, uh, the board's, uh, deference in, in, um, and drawing, uh, making credibility determinations is justified only if it actually makes the credibility determination. It's not enough to simply find that some of the evidence points one way and some of the evidence points the other way. And we would submit that the conflict is not actually, uh, that significant. Go ahead. I'm sorry. That's okay. So you agree that the standard of, of proof on to invoke an exemption is on the employer here, and it's got to be established by preponderance of the evidence. Do you agree that that's the principle that should be followed? Yes. Do you also agree then if evidence is in conflict, one side is not preponderating over the other. If the judge makes no judication between the two conflicts, they're an equipoise. Therefore the preponderance hasn't been met. Isn't that, that's what happened in the context of conflicts that were unresolved in this case? No, I don't think so. Your Honor. I don't, I think I would distinguish between finding conflicting strands of evidence and finding the evidence in equipoise because I don't think that those two things are the same. Uh, here I, I think the, the key error that the board made on its, uh, in its footnote on its ruling on review was in saying that the evidence was in conflict over whether, um, system operators could command dispatchers or field supervisors, uh, principally to dispatch employees to a particular site. But if we have to review that for substantial evidence, was there substantial evidence for the following conclusion? These two points are in conflict. If our answer to that is yes, we are, we have to deny your petition. Well, I, I don't think you can, you can draw that conclusion based on what the, the board gave you here, because the regional director, uh, held to the contrary that field supervisors can direct system, uh, I'm sorry, uh, that system operators can direct field supervisors to dispatch a crew to a particular site. That's at appendix 27. And as board council, right, but there's evidence in conflict with that, but that's the regional director's own finding. And board council says, and it's brief in, in their brief that on page 13, but those findings were adopted by the board majority in full. Um, and so whatever reason decision-making and substantial evidence mean, they can't mean that the board can say something both happened and did not happen, or that there was insufficient evidence that had happened at the same time. But under certain, a certain of the findings by the regional director said certain points, there's a conflict in others. It made a determination that the evidence it accepted preponderated in favor of a conclusion, for example, that the, um, systems operators did not have authority to assign. They may not have agreed on every little factual matter that might have been some accomplished, but ultimately that was its decision. Aren't we reviewing that for substantial evidence? Well, the regional director made a lot of findings that are inconsistent with that conclusion, uh, and did not find that the evidence was on conflict on those points. Um, for instance, the idea, and these are the four points that I started with. The regional director didn't dispute. In fact, it found that system operators can determine when it is necessary to dispatch a field crew to a location for repairs. That's appendix 31. Uh, the regional director found that system operators make priority decisions, which can mean dispatching field employees from a small outage to a large outage. That's appendix 27. The regional director found that system operators determine the number and types of crews dispatched. That's appendix 26, and that the system operator, and I quoted this just before, can direct field supervisors to dispatch a crew if one is needed. Those are the same four points that the board found were indicative of supervisory authority in energy three. Much of what you said, uh, logistics. In other words, sending crews out, uh, moving crews from one location to another. How does that make them supervisors? They don't supervise them on the job site. They send them there, but they don't really supervise what they are doing or how they perform their functions. That's fair, your honor, but the board's Oakwood healthcare ruling identifies three types of I think turned on assignment, and that's what I was referring to as well, and one of those types of assignment authority is assignment to a place, and the board treats that as a different type of assignment authority from assigning to significant overall duties, and this is entirely separate, both under the board's case law and the statutory language from directing, responsibly directing. That doesn't sound to me like it's supervising if the function is only to assign an individual from point A to point B. You consider that to be supervising? Yes, your honor, and that was what the board held, uh, in energy three, um, quite, quite explicitly, and it's consistent as well with Oakwood healthcare. I think, uh, both, um, board counsel and the IBEW suggests that temporarily assigning, uh, an employee to a particular location is not sufficiently, um, you know, long-term to qualify as supervisory assignment, but in Oakwood healthcare, one of the groups of, uh, supervisors, of purported supervisors there, the emergency room charge nurses, just made decisions to send, uh, particular nurses, uh, on a given shift to a particular place in the, uh, emergency room, and that, uh, and there the board held that that was assignment. Now, for those employees, it found a lack of independent judgment, but here, I think, if you agree with us that assigning, uh, directing and dispatching crews to one location rather than another qualifies as assignment to a place, then I think that the record is quite clear that doing, making those kinds of judgments in multiple outage situations, uh, require independent judgment and not merely routine or clerical, um, sorts of decision making. Yeah, you use the word dispatching, which reminded me of another thing, like police officers, uh, dispatch, uh, squad cars from one to another. Now, you, you wouldn't say that that is supervising the, uh, the officers themselves, would you? Well, I'm not aware of any case law on that, your honor, um, but I, I, I, I just think it's possible, um, it's that word dispatch that you use, which seems to me to suggest that all I am doing, it's, it's a very straightforward function. I am sending this individual location for a work assignment, but I don't supervise how that person does the job. I don't supervise what is going on at the work site. I am merely sending an individual from one place to another, but you, you, and it's supervising. Yes, I would. And the employees that were held to be supervisors in Entergy 3 were dispatchers. That was their job title, in fact, um, and the board found that that was, uh, assignment authority assignment to a place in the fifth circuit, uh, affirmed that, uh, and I think that that is consistent. I mean, I think that makes sense because, um, if, if we treat assigning an employee as a separate function from responsibly directing, and I think we have to do that given the language of section 211 of the statute, um, then they, they have to mean different things. And I think given the board's distinction between assignment to a place, assignment to a time, and assignment to significant overall duties, um, you know, assignment to a place is that determines where a group of workers will perform their job duties on a given day. The record is, is such that the decision of where work needs to be performed did not include for these systems operators who was going to do it. Someone else decided that, correct? Under our record, not Energy, under our record. Well, I think the record, I think the record is a little more nuanced than that, Your Honor, because several of the witnesses testified, including the union's own witness, Jim Luciani, uh, he testified that sometimes he does, uh, tell field employees to go to a particular location. Let me ask you a different question. I'll accept your representation on that because time is, is short. As I understand it, the union currently represents as part of its bargaining unit, the dispatchers in the controller. If they're, if they're not supervisors, then how could the systems operators be supervisors? Well, I think, I think they're the, the answer, Your Honor, is that, uh, the system operators have a much broader, um, responsibility in terms of, of making decisions that, about how the entire, uh, grid for the company is affected by a particular decision. And there was much testimony on this point. And so they, they in the control room, they outrank the dispatchers. No one disputes that. And for about two thirds of the entire work week, because this is round the clock work, they don't have any more, anyone more senior, uh, than them supervising, uh, them. And, uh, because they only have the one, uh, shift manager, uh, who testified here. And so they are doing work that is, uh, while in some, maybe not, um, qualitatively different, it's certainly quantitatively different in the amount of of judgment required in order to make these large scale, uh, determinations. Would I be correct? Would I be correct in saying that system operators send workers to the field, to specific locations to do work, but they don't tell those workers how to do their job. They don't supervise the actual, uh, electrical work that they do. Is that? That's not, that's not quite accurate, Your Honor. I do agree that they do that first thing. They send employees to particular, uh, locations, uh, but they're, they do provide instruction as well. And I think the clearest example of this is in the switching instructions that they provide that tell field workers the order in which they need to perform specific tasks to make sure that they do those things safely. Um, and so I think that, I think, I think that's not, uh, controverted. Uh, there is a separate question as to whether that in itself, uh, qualifies as, as, uh, sufficient, uh, evidence of supervision, um, in, in terms of responsible direction. But what they actually, what they actually do is, is tell the line worker, uh, to cut certain power off, uh, to a, to a certain location so that work can be done on those lines. Is that accurate? I think it's more complicated than that, Your Honor. Um, I think the, the instructions are step-by-step and a fairly bit more detailed than that. Um, but, but that is separate and apart from their, um, assigning employees to particular, uh, places. Okay. Uh, Judge Swartz, do you have anything more? Uh, no, not now. Thank you. Judge Fuentes? Uh, not now. Thanks. All right. Very well. Thank you, uh, counsel. And we'll hear you back on rebuttal. Um, and, um, who shall go first for rebuttal? I will, Your Honor. Go ahead then, please. Okay. This is David Casserly representing the National Labor Relations Board. Uh, may it please the court, I'd like to first start by briefly addressing Entergy and explaining why that case doesn't have much relation to this case. And here's why. In Entergy, it was undisputed that the, uh, what the dispatchers in that case were doing, uh, was considered assignment. In other words, the board initially in Entergy, in the very first Entergy 1 case, uh, noted this is assignment, sending people to places, the union doesn't dispute this. When it went up to the, uh, on appeal to the Fifth Circuit, the question was whether they, uh, whether they exercised independent judgment in making those assignments. And so on remand in Entergy 3, when the board's considering all these factors about, well, they consider how many employees need to, um, report to this location, they consider what types of crews, those were not going into the factor of whether they had assignment authority in the first place. That was undisputed. The board said they undisputedly had that authority. The question was whether that meant that they exercised independent judgment in that authority, in using that authority. Now, here we have a different situation. System operators here, uh, unlike, I of, uh, questioning, they do not assign specific employees to go to specific places. What they do is when there's an unexpected outage, not planned work, but an unexpected outage, uh, they can call a field supervisor and say, this is our next priority for where work needs to be done, uh, and ask the field supervisor to dispatch a crew to that priority. The field supervisor determines when to dispatch a crew to that place, uh, which crew and which particular employees to dispatch. And that's what the board found here was not sufficient for assignment authority on the system operator's part, that there's this intervening supervisor doing the actual assignment. Can I ask you about the standard of review question? Your adversary assumed for the purpose of this question, it was preserved and assumed that you understood what was preserved is whether or not the, uh, NLRB and the regional director applied the preponderance of the evidence standard. Okay, so just assume that it was preserved and that was the issue. In looking at, uh, the, the NLRB's ruling, it uses the word unclear twice. It uses the word clear once. Um, it describes the evidence as conflicting. Does any of that connote, and if not, why not, an application of a clearly clear and, um, convincing standard as compared to the preponderance standard? Your Honor, and, uh, first of all, no, uh, simply using the word clear isn't enough to convert this to a clear and convincing evidence. Indeed, uh, courts have consistently in supervisor cases, we point out a few of the, um, situations that are brief said the evidence is unclear. Therefore, we uphold the board's decision when, again, this has always been in a preponderance of the evidence standard. Uh, so simply using that word doesn't actually make this a different standard of proof. Second, um, there's, it's also worth separating, separating out two concepts here. The burden of proof and the standard of proof required is one concept, but on the other there's also the specific evidentiary, uh, rules that the board uses for which evidence it gives weight to. And one of those rules has always been that it gives weight to specific evidence and to evidence from, uh, those employees who are in the field and actually working with the putative supervisors directly rather than generalized management testimony. And the board applied that here. And that has been accepted by many courts, including this one in subacute with no, uh, question about how that would detract from the burden of proof. Instead, that's an issue of which kind of evidence the board would find most convincing. What? So from looking at the opinions of the board and the regional director, how give us examples of how we know, I know in the regional directory articulated, I'm applying components of the evidence. The board didn't expressly say that. How do we know that's the standard of proof being applied here? Well, I mean, again, I think you said it, your honor, when you said the regional applied that, but even looking at the decision itself here, the board has a requirement of specific examples being shown. If the evidence is conflicting, otherwise, in other words, do you have two parties who are one of them sends a management representative up there and says, okay, these employees, these employees definitely have the authority to require field supervisors to send a particular person to a particular place. Another, uh, an employee testifying for the union comes up and says, no, I don't, I don't have that authority. I can ask, but that's all I can do. Uh, the board's way of resolving that is to require that the party with the burden of proof provide a specific example of the time that that has happened. Uh, and that's what the regional director was noting here has never happened. We don't have any specific examples in the record at all of a time when a system operator told a particular employee, you must report to this location at this time. That has never happened. There's no example of it. And so as you saying that by this requirement of a specific example, the evidence then becomes more likely than not. Otherwise it's equal. Yes, your honor. The board will find generally if there's a, if there's generalized testimony, that's conflicting. The board will generally resolve that against the party with the burden of proof and say, those are equal. But if there's a specific example in there on one side, then the in making these supervisory determinations, you just said that there's not, there's never been an instance where a system operator said you must report to this place at this time, but isn't that precisely what they do? System operators send out crews. No, your honor. That's, that's the job of the dispatchers and sometimes the field supervisors, the system operators determine the need for a crew in the first place. So they determine, okay, this is an outage for unexpected outages. Again, when there's planned work, there's other entities that have some say in that. But for an unexpected outage, if a system operator can't deal with it by switching the load themselves, automated in the control room, then they talk to the dispatcher or to the field supervisor and request that a crew be sent out to that location. They don't solve it. The system operator itself does not send the crew out to one location and redirect that same crew to a separate location. No, your honor. They make the priority decisions and they don't, they don't control where a particular crew will go later. There's no evidence of the system operator doing that. And they cannot, and there's also, as the regional director found, they can't require that a crew be held over for overtime or something like that. That's all the field supervisor's duty. They can say, you know, we need somebody to keep doing this work. It needs to be done today. But the field supervisor is the one who decides whether to send out a new crew or whether to hold over a crew for overtime or something along those lines. Can the system operator direct an employee to direct, to cut electricity from one wire to another? Um, so sort of, your honor, there's, I believe Mr. Keneally touched on this in his argument, but system operators generally, they'll say this is the job that needs to be done in, in terms of setting priorities. When it comes to the granular level of telling an employee to do an individual task, the system operators ahead of time, write out switching instructions that they copy from a substation manual. Okay. The substation manual sets out what pieces of equipment are in a particular substation in the order that they have to be disconnected in order to de-electrify a particular piece of equipment there. And that's called their permitting and tagging process when system operators write that out. And so what. It does sound like supervising though, doesn't it? Well, except that, um, so for that part of their duties, your honor, all the system operators do is they copy it from the manual and they write the steps out. They then sent that, uh, to the field person, but they don't know who's going to be doing it. So they're not supervising the particular tasks as they're happening. They're not determining how the, this field person does their job, or even they don't really have any control over who is doing it. That's, they find out when the person calls them to say, okay, are these the correct switching instructions? Uh, and the board found that, you know, we don't deny that that could be direction standard, but there are two issues with that. One is that it doesn't involve independent judgment as the board found, because it's all they're doing is switching the steps from a manual and they don't have any authority to change the order of the steps or anything like that. In other words, if in a substation, there's several different ways you could isolate a particular piece of equipment. The system operator will write the same exact instructions to do the same exact order every time. And that's, what's expected of them. They're not expected to say, okay, in my judgment, I think you can skip this step this time. They don't do that. But you gave us, um, you collectively, there's one example of one guideline. I know the record says there's 150 or so specific guidelines that direct and circumscribe what the systems operator can do. But in the one that was provided, it says the following guide, and at times there may be special circumstances that may make it desirable or even necessary to deviate from these guidelines at the system operator's direction. That's AR 494. So if, if that's the case, does that undercut your argument that they lack independent judgment? Your Honor, those guidelines. So there are two sets of guidelines that we're talking about here. One is the set of guidelines that determines how a system operator switches the load. Okay. So how they determine where electricity is going in the system. Uh, and for those guidelines, we don't deny that they can deviate from those and that there's testimony in the record that they can, but when writing these particular switching instructions for a particular thing, that's, that's all in a substation manual and there's no indication that they can deviate from those. I understand. Let me, let me ask you this question. Yes, Your Honor. Systems, uh, I want, I want to talk about, uh, performance reviews. There's some testimony in the record that suggests that system operators might, uh, quote, take a hit, close quote, if field employees under their purview commit more than 25 errors in the field. Um, and I'm wondering why shouldn't we read that to support the notion that, um, the company's position is correct, that they are accountable for the action of some other employees. So Your Honor, I have two answers to that. First of all, um, I don't believe there's record evidence that, uh, with the, I think the part that was under their purview, that wasn't testified to. It's if there are 25 field employees, there's no indication if these are field employees who were carrying out switching instructions that the particular system operator being evaluated, uh, had given. In other words, this is an overall performance standard for the whole unit. And, uh, these evaluations affect system operators in some collectively. It's not about particular employees who are, uh, there's no evidence that there's a particular employee's action would affect, uh, the system operators. But, and keep in mind that plays into that if this is the same evaluation form used for both dispatchers who are not supervisors and system operators, it's again, it's a generalized, okay, these are what the company considers in terms of the unit's performance as a whole. But then second, if you look at the forms themselves, there has been no example of a particular system operator taking that kind of hit that was generalized testimony. But if you look at the examples, there's a spot on the form that says eight field tagging errors or something like that. Uh, but it's not checked off or discussed in either of the actual examples of these performance evaluations that are in the record. So the RD reasonably found looking at that, okay, I don't actually have any proof here that these, that this affects the employment of the, uh, system operators. The, uh, let me ask one, one more question. The term supervision to me, uh, applies a certain degree of, of discretion. Uh, is it your view that system operators exercise no discretion in the work that they do? Uh, no, your honor in, uh, so under the board law, independent judgment has to be exercised in regard to one of the 12 supervisory functions in order to render an imputative supervisor and a supervisor under the statute. So it's, it may be true that system operators have a lot of discretion in their job. It may be true that they have a lot of discretion in determining when to say, dump the load and cut off some customers in order to, uh, preserve the integrity of the system. But that's, that's the same as in say NSTAR, the court noted, the, uh, putative supervisors there had the ability to do that. They could cut off a lot of customers and it was their sole discretion to do that. But that didn't mean they supervise other employees because it wasn't, they didn't have that discretion in responsibly directing or in assigning other employees. And so that was the board's finding here. It's not that these system operators don't wield any discretion or that the work they do doesn't involve a lot of important decisions. It's just that those decisions don't involve actually supervising other employees. Uh, Judge Schwartz, you have anything further? No, thank you. Judge Fuentes? No, no, thank you. Okay. Council, thank you so much. Uh, I believe we, uh, move to Mr. Jarvis at the moment. Yes, thank you, Your Honors. And, uh, good afternoon. May it please the court. Um, the points I wanted to make, and I'll be brief because I know my time is limited, are just a couple. And what I wanted to, to stress is that the region twice held that systems operators and senior systems operators were not supervisors. I, I remind the court that there was the hearing, the regional, uh, director made his decision. The election was lost. There was a subsequent, uh, election and the parties opted rather than redoing the hearing or introducing more evidence, um, stick to the facts. And, you know, again, and, and, and Your Honors have noted that whenever there's evidence that's in conflict or inconclusive, the board will find the supervisor status has not been established because that preponderance has not been met. And I would just remind the court that it was after the very first hearing, um, uh, in this matter or in March of 2017, that the regional director made a decision that there was conflicting evidence, um, and that it was not clear to the point that there was supervisory status and rules that these individuals were not going to be deemed supervisors for purposes of the act. Rather than when the second petition was filed, rather than going back and cleaning up that evidence, rather than introducing additional evidence to clarify the supposed supervisory status of these individuals, um, the employer and the parties opted to stick to that decision. And, and the acting regional director, uh, subsequently once again, um, approved the decision and then it went down to the board and the board also, um, confirmed that decision. And what that suggests is that the record evidence that you have before you from that hearing is the best that the employer has. The employer now comes to you and asks you, uh, this honorable court to change those determinations that were made by the regional director, um, who was privy to that testimony and making those factual determinations. And the employer relies very heavily on the entrogy matters. And yet the entrogy courts themselves noted that this is a very fact sensitive question. There's no categorical rule that all dispatchers must have the same supervisory status. And also noted that because of the infinite and subtle gradations within a company, courts normally extend particular deference to NLRB determinations that a position is supervisory. And so, uh, that decision, um, was made having had the benefit of the hearing and the transcript and making that factual determination. And the employer I would submit to you had an opportunity when the second petition was filed to go in to supplement the record and to try and clear up any conflict, uh, in the evidence or lack of evidence that was there. And rather than do that, um, they bring this action, uh, to this court. Um, I think counsel has covered the other arguments with respect to the specific duties that system operators have, um, and how and what they do in prioritizing work. And quite frankly, the evidence is in conflict, um, and the evidence is not there to support supervisory status. And so with that, I'll, uh, I'll waive the rest of my time and take any questions the court may have. You, uh, you did say the courts, uh, tend to defer to the NLRB in what amount to a supervisor? Yeah, the citation is in the one right in front of me. Um, I, I believe it was the most recent one, energy five in which the fifth circuit, uh, stated that because of the infinite and subtle gradations within a company, courts normally extend particular deference to NLRB determinations that a position is supervisory. And I know I have it in my papers. I apologize to your honor. I don't have the specific page number, uh, in front of me in my notes here. Okay. Thank you. Judge Schwartz. I'm fine. Thank you. Uh, Judge Finney, is anything further, sir? No, thank you. All right. Um, counsel, thank you, uh, so much. Thank you. We will, uh, move back to, uh, rebuttal. Thank you, your honor. And just, uh, three quick points, if I may. Um, the difference between this case and Entergy is that in Entergy, it was undisputed that, uh, those types of activities qualified as assignment to a place, but here, uh, it is very much disputed. I would just note that there is nothing in the board's, uh, half of a footnote on appendix page five, uh, that suggests that it was distinguishing Entergy on those grounds. And under the Chenery doctrine, as this court, I'm sure well knows, uh, the court has to assess the grounds actually relied upon and invoked by the agency and cannot substitute grounds that it thinks are more adequate or proper. Um, and so we would submit that if nothing else, the, the board has to distinguish this case from Entergy beyond what it did here, because as, as, uh, Justice Alito noted when he was on this court, uh, in the Stardine case, that dis, ability to draw distinctions between, uh, cases that look similar, uh, from one another is imperative for the court to be and ensure that the agency isn't acting arbitrarily. Uh, my second point is that Mr. Castro Lee suggested there was no example of a specific instance, uh, in which a system operator dispatched a crew to a site. And I would just point to AR 225, uh, where Jim Luciani in response to questioning by Mr. Jarvis, uh, was asked, do you direct frontline people to go to substations? And he said, if there is an alarm or something that we receive an alarm, we may tell them to go. And so it's not in dispute that sometimes system operators do directly tell field workers to go to a particular location, and that's consistent with the managerial testimony. And under, uh, the Fifth Circuit's recent STP nuclear decision that we, uh, uh, quoted in our reply brief, um, it's not sub, substantial evidence requires more than just crediting the isolated snippets of union testimony that, uh, go against supervisory status while disregarding all of the contrary union testimony and all of the managerial testimony. Uh, and then fine. May I ask you, it sounds like in your view, directing an individual to go from point A to point B is supervising that individual. Is that, is that your, um, your argument? Yes. If that determines where that individual is working in a given shift, then yes, that is, supervision under, uh, enter G3 and under Oakwood itself, I would submit. And then my, my final point, your honors, and I appreciate the court's patience, uh, is, is just that, uh, in response to Mr. Jarvis's points that there was somehow something improper about, uh, relying on the regional director record from the first go around. I don't think that that argument was really briefed in this court. It was however briefed, uh, in front of the NLRB. And if the court is interested in that topic, although I don't think it's properly before the court, uh, I would, uh, point the court to our, uh, reply to the, um, IBEW's arguments, uh, in front of the board, um, which is in the administrative record before the court. Uh, and that's consistent with board regulations. Um, and so there's nothing improper about it and there's nothing unusual about it because I, uh, maintain and will again repeat that. I think if you take the regional director's own findings, uh, as I quoted, um, to the court before, um, I think that that is enough to find that this case is on all fours with enter G3, or at least so close as to require a better explanation, uh, than the board gave here. And so we would ask the court, uh, not to enforce, um, the board's decision and to set aside the rulings. Well, thank you very much, counsel. And thanks to you, to all counsel, uh, for the, uh, interesting arguments this morning, uh, we'll end into the afternoon and, uh, we'll take this under advisement and.